UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 06-60123-CR-UNGARO-BENAGES/O'SULLIVAN

UNITED STATES OF AMERICA,

   Plaintiff,

v.

RICHARD PIERRE CAMBRONNE

   Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the defendant Richard Pierre Cambronne's Motion to Suppress Contraband and Post-Arrest Statements (DE# 25, 10/05/06). On October 11, 2006, this case was referred to United States Magistrate Judge John J. O'Sullivan by the Honorable Ursula Ungaro-Benages, United States District Court Judge for the Southern District of Florida. Having heard oral argument on October 24, 2006 and carefully considered the defendant's motion, the court file and applicable law, the undersigned respectfully recommends that the defendant Richard Pierre Cambronne's Motion to Suppress Contraband and Post-Arrest Statements (DE# 25, 10/05/06) be **DENIED**.

### BACKGROUND

The defendant is charged with possession of more than five (5) grams of a mixture and substance containing cocaine base commonly known as "crack cocaine," in violation of Title 21,

United States Code, Section 844 and possession of a firearm and ammunition by a drug addict or user in violation of Title 18, United States Code, Section 922(g)(3).

## FINDINGS OF FACT

On January 20, 2006, Detectives Neese and Reid were assigned to the criminal investigation unit for the City of Coral Springs Police Department. While on patrol, Detective Neese was driving an unmarked Toyota Camry assigned to him. Detective Reid was a passenger in this vehicle. Both detectives were on duty wearing plain clothes and a vest with the words "Police" written across the front.

### A.   The 7-Eleven

Around 11:00 or 11:30 p.m., the detectives approached a 7-Eleven located at 7811 West Sample Road in Coral Springs, Florida, when they noticed a green Infinity that was parked in a suspicious manner. Because of the parking lot layout, vehicles entered the 7-Eleven from the west to the east. The parking spaces were angled so that drivers would park facing the store. The Infinity, however, was not parked facing the store. It was backed into a parking space, facing West Sample Road. The 7-Eleven was in a high crime area where a lot of robberies had occurred. The detectives were concerned with a potential robbery.

The detectives parked two parking spaces away from the Infinity and waited before approaching the Infinity to ensure that no one was crouched inside. The defendant was inside the store with the 7-Eleven clerk. Once they ascertained that the car was unoccupied, Detective Reid exited the Camry to obtain the Infinity's license plate number. A license plate search revealed that the Infinity's license plate belonged to a white Ford Taurus.

The detectives waited for the defendant to return to his car to investigate further.

Detective Reid exited the Camry as the defendant was returning to the Infinity. The defendant opened the front passenger side door and sat down in the passenger seat. Detective Reid approached the defendant in the passenger side of the Infinity to discuss the license plate and why the defendant had backed into the parking space. Detective Neese approached the driver side of the Infinity. The defendant explained to Detective Reid that he recently purchased the Infinity, previously owned a white Ford and was in the process of changing the license plate. Detective Reid asked the defendant if he had anything illegal on him or in his car.[1] The defendant replied that he had a small amount of marijuana.

While Detective Reid was speaking with the defendant, Detective Neese observed through the driver side window a green, leafy substance appearing to be marijuana on top of a $10 bill on the center console of the Infinity between the passenger seat and driver's seat.[2] When Detective Neese saw the marijuana, he advised Detective Reid, through a police signal, that drugs had been found.

After discovering the marijuana, Detective Neese radioed for a K-9 unit to determine whether there was other contraband in the Infinity. The K-9 unit arrived shortly. The K-9 officer walked the dog along the exterior of the car. The dog was also released inside the Infinity. The dog alerted to the driver's seat. Detective Neese looked under the driver's seat and saw a semiautomatic handgun in a holster. Upon discovering the gun, Detective Neese communicated to Detective Reid through a police signal that he had found a gun in the car. At that point, Detective Reid placed handcuffs on the defendant. Detective Reid remained with the defendant, while

---

[1] Both detectives identified the defendant as the occupant of the Infinity.

[2] Detectives Neese and Reid previously attended narcotic identification school and received on-the-job training with respect to identifying narcotics including marijuana and cocaine.

Detective Neese continued searching the Infinity.

Detective Neese retrieved the handgun and placed it on the driver's seat. He looked under the driver's seat again and found a purple pill bottle.[3] Detective Neese opened the purple pill bottle and found several yellow, rock-like substances which he believed were crack cocaine.[4] Once Detective Reid secured the evidence, he conducted a routine inventory search of the Infinity at the arrest site. He did not find additional contraband.

One of the detectives radioed for a marked unit to transport the defendant to the Coral Springs Police Station. The Detectives waited for a tow truck to take the Infinity before going to the police station to complete their paper work.

**B.     The Police Station**

The defendant was in the process of being booked in the first floor booking room, when Detective Reid arrived.[5] Detective Reid advised the defendant of his <u>Miranda</u> rights. Detective Reid did not read the <u>Miranda</u> rights from a card. Instead, Detective Reid recited the <u>Miranda</u> rights from memory. At the evidentiary hearing, Detective Reid testified as follows:

> I advised he had the right to remain silent, anything he said can and will be used against him in a court of law, he had the right to speak to an attorney. If he could not afford to hire an attorney one would be appointed to represent him at the county's expense. At any point during the questioning he could decide he did not wish to speak to me further.

(October 24, 2006 Transcript Excerpt at 1). On cross-examination, Detective Reid was asked to

---

[3] Detective Reid described the object containing the crack cocaine as a toothbrush holder.

[4] The substances retrieved from the Infinity tested positive for marijuana and crack cocaine, respectively.

[5] Detective Neese did not speak to the defendant either at the scene or at the police station.

4

again to recite the <u>Miranda</u> rights he gave the defendant. He recited the <u>Miranda</u> rights as follows:

> You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to speak to an attorney, *have him present during questioning*. If you cannot afford to hire an attorney one will be appointed for you at county expense. If you decide not answer my questions at any point during questioning you have that right. I would then ask, do you understand those rights? Would you like to have an attorney present?

(October 24, 2006 Transcript Excerpt at 2) (emphasis added).

The defendant stated that he understood his rights and did not want an attorney. Detective Reid proceeded to ask the defendant about the contraband. The defendant stated that he had a concealed weapons permit and that the crack cocaine was his. The defendant stated that he had been visiting a girlfriend but could not provide Detective Reid with any information verifying this statement. The defendant also stated that he was at the 7-Eleven buying a cigar so he could smoke marijuana inside the cigar.

Detective Reid had observed that some of the crack cocaine was wet, indicating that it had recently been prepared. When he questioned the defendant about the cocaine, the defendant said it was his, for his personal use and had no intention of selling it. The defendant did not appear as if he had been smoking crack cocaine. Detective Reid questioned the defendant for approximately three to five minutes in the booking room.

Following this initial questioning, Detective Reid asked the defendant if he wanted to go upstairs to speak to agents from the Bureau of Alcohol, Tobacco and Firearms ("ATF"). Detective Reid felt that in a formal setting, he would get more information from the defendant. The defendant agreed to go with Detective Reid to the second floor interview room.

The defendant and Detective Reid continued their conversation inside the second floor interview room while the video camera was being set up. Once the video camera began recording,

Detective Reid presented the defendant with a "Rights Form."[6] Detective Reid asked the defendant to write "yes" or "no" in response to each question on the Rights Form. The defendant was also asked to initial his responses. The defendant proceeded to fill out the Rights Form.[7]

> The form contained, in part, the following statements and questions:
>
> You have the right to talk to an attorney/lawyer before talking to me and to have an attorney/lawyer here with you during questioning now or later. Do you understand?
>
> If you cannot afford or retain your own attorney/lawyer and you want an attorney, one will be appointed for you before we ask you any questions. Do you understand?
>
> If you decide to answer the questions now, without an attorney present, you will still have the right to stop answering my questions at any time until you talk to an attorney. Do you understand?

Motion to Suppress (DE# 25 at 6, 10/05/06).

In response to each of the above questions, the defendant wrote "yes" and his initials. However, the defendant initially wrote "no" in response to the subsequent question: "Knowing and understanding your rights as I have explained them to you are you willing to answer my questions without an attorney present?" Detective Reid was surprised by the defendant's response based on what they had previously discussed in the booking room and the defendant's answers to the preceding questions. Detective Reid wanted to ensure that the defendant understood that if he was not willing to answer Detective Reid or the ATF agents' questions without an attorney, the questioning would stop and they would leave the room. Following Detective Reid's explanation,

---

[6] A copy of the Rights Form executed by the defendant is attached to the defendant's Motion to Suppress (DE# 25 at 6, 10/05/06).

[7] At the evidentiary hearing, the government played a portion of the videotape of the defendant completing the Rights Form.

6

the defendant scratched off the word "no" and wrote "yes" in response to this question. The defendant also wrote his initials next to this response. The defendant admitted that the crack cocaine was his but did not want to give law enforcement any information concerning where he got it. The defendant felt that disclosing this information would not help his situation.

The last question asked the defendant if he had "previously requested any law enforcement officer to allow you to speak to an attorney." The defendant wrote "no" and his initials.

The defendant also completed and executed the following statement included in the Rights Form:

> I ["Pierre Cambronne" handwritten], have read this statement of my Rights, or have had it read to me and understand what my Rights are. I am willing to make a statement and answer questions. I do not wish an attorney be present at this time. No threats or promises have been made to me. No pressure of any kind has been used against me. I understand and know what I am doing, and this statement may be used in a court of law against me.

Motion to Suppress (DE# 25 at 6, 10/05/06). This statement was signed at the bottom by the defendant. Id. The defendant was questioned for about an hour in the second floor interview room.

## ANALYSIS

**I. Physical Evidence**

The defendant argues that the police did not have a legal basis to search his car without a warrant. (DE# 25 at 3, 10/05/06). The Fourth Amendment provides that: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. "In general, warrantless searches are permissible only where an individual has a substantially reduced expectation of privacy.... Situations in which such expectations are reduced include automobile searches, searches incident

to arrest, [and] items in plain view believed to contain contraband." Bourgeois v. Peters, 387 F.3d 1303, 1314-15 (11th Cir. 2004).

To justify the application of the plain view doctrine, the seizing officer must (1) have independent justification for being in a position to see the items; (2) must discover the items inadvertently and (3) must immediately observe that the items are evidence. United States v. Blum, 753 F.2d 999, 1002 (11th Cir. 1985) (citing Coolidge v. New Hampshire, 403 U.S. 443 (1971)). "The [] requirement, that the officer have a lawful right of access to the object, is meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances but does not bar the seizure of evidence in a parked car." Boone v. Spurgess, 385 F.3d 923, 928 (6th Cir. 2004).

Here, the defendant's Infinity was parked in a convenience store parking lot, a public place. See U.S. v. Sherriff, 546 F.2d 604, 607 (5th Cir. 1977) (noting that parking lot adjacent to a mobile home was a public place for purposes of Fourth Amendment analysis and defendant had no reasonable expectation of privacy). The marijuana was on the center console of the Infinity between the driver's seat and the passenger seat. Detective Neese saw the marijuana through the driver side window. Thus, the marijuana was in plain view when Detective Neese discovered it.[8]

Moreover, as long as law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception. See Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). Probable cause exists when, given the totality of the circumstances, a

---

[8] Additionally, the detectives' license plate search did not violate the defendant's Fourth Amendment rights because he had no reasonable expectation of privacy concerning the information on his license plate. See U.S. v. Ellison, 462 F.3d 557, 562 (6th Cir. 2006) (holding that "motorist has no reasonable expectation of privacy in the information contained on his license plate under the Fourth Amendment."). Indeed, one purpose of license plates is to allow law enforcement to identify vehicles.

reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place. See Illinois v. Gates, 462 U.S. 213, 238 (1983). Here, the marijuana that was found in plain view on the center console gave Detectives Neese and Reid probable cause to search the rest of the defendant's Infinity for more contraband. United States v. Fladten, 230 F.3d 1083, 1086 (8th Cir.2000) (concluding that observation of "[a]n item commonly used in the manufacture of methamphetamine ⋯ in plain view in the back seat" of an automobile gave officers probable cause to search other parts of the automobile for further contraband or evidence). Thus, the search resulting in the discovery of the gun and the crack cocaine did not violate the Fourth Amendment.

## II. The Defendant's Post-Arrest Statements

The defendant argues that his statements to the police should be suppressed because he exercised his right to counsel while filling out the Rights Form in the second floor interview room. At oral argument, defendant further argued that if the initial Miranda rights were improperly recited by Detective Reid, then all subsequent statements made by the defendant should be suppressed because the police could not justify attempting to clarify the defendant's decision to write "no" on the Rights Form in response to whether he was willing to speak to police officers outside the presence of an attorney.

In order to establish a valid waiver of Miranda rights, the government must show, by a preponderance of the evidence, that the defendant voluntarily, knowingly, freely and intelligently waived those rights, with knowledge of the consequences of the waiver. Colorado v. Connelly, 479 U.S. 157, 168 (1986); see Moran v. Burbine, 475 U.S. 412, 421 (1986); Schneckloth v. Bustamonte, 412 U.S. 218 (1973). The validity of the waiver depends upon the particular facts

9

and circumstances surrounding the case, including the background, experience, and conduct of the accused. Edwards v. Arizona, 451 U.S. 477, 482 (1981); see Moran, 475 U.S. at 421.

Detective Reid recited the defendant's Miranda rights while he was being booked. The defendant appeared to understand his rights and affirmatively commented that he wanted to speak to law enforcement and did not want a lawyer. After speaking to the defendant for three to five minutes in the booking room, Detective Reid asked the defendant if he would go to the second floor interview room to speak to ATF agents. The defendant again agreed to speak to law enforcement. Thus, the defendant willingly and knowingly waived his Miranda rights.

Additionally, the defendant did not unambiguous or unequivocally assert his right to counsel. "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Davis v. United States, 512 U.S. 452, 460 (1994). While in the second floor interview room, the defendant was presented with a written document, the "Rights Form," which delineated the Miranda rights officer Reid had previously recited. The defendant, consistent with his prior statements to Detective Reid in the booking room, wrote "yes" in response to three questions on the Rights Form acknowledging that he understood he had a right to talk to an attorney, that an attorney would be appointed if he could not afford one and that he still had the right to stop answering questions and ask for an attorney. (DE# 25 at 6, 10/05/06). At no point did the defendant ask for an attorney. Instead, in response to the next question, "Knowing and understanding your rights... are you willing to answer my questions without an attorney present?," the defendant wrote "no." Detective Reid was justified in clarifying the defendant's response given the defendant prior statements in the booking room and his responses to the preceding questions.

In <u>Davis v. United States</u>, 512 U.S. 452, 460 (1994), the Supreme Court held that "after a knowing and voluntary waiver of the <u>Miranda</u> rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." The Court further explained that:

> when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney.... Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel.

<u>Id</u>. Here, Detective Reid attempted to clarify whether the defendant wished to speak to law enforcement without an attorney present. Detective Reid's desire to clarify the defendant's response was reasonable in light of the defendant's responses to the preceding questions and his agreement to speak to Detective Reid without an attorney when he verbally received his <u>Miranda</u> rights in the booking room. Once Detective Reid advised the defendant that he and the ATF agents would leave the room if he asserted his right to counsel, the defendant changed his answer. It was clear that the defendant wanted to speak to law enforcement but was concerned about giving up his source. Of note, the defendant admitted that the crack cocaine and gun were his, but did not provide law enforcement with information concerning his source. He did not believe revealing his source would help his situation. The government has no duty to cease interrogating a suspect "where the suspect's invocation of [his Miranda rights] is equivocal." <u>United States v. Acosta</u>, 363 F.3d 1141, 1152 (11th Cir.2004); <u>see</u> <u>also</u> <u>United States v. Mikell</u>, 102 F.3d 470, 476 (11th Cir.1996). Accordingly, the government did not violate the defendant's <u>Miranda</u> rights.

Based on the record and evidence presented at the evidentiary hearing, the undersigned finds that the defendant's statements were voluntary and were made after being advised of his

Miranda rights. The defendant did not unequivocally or unambiguously ask for an attorney. Thus, Detective Reid could clarify the defendant's inconsistent written response. Lastly, there were no threats or coercion by the police. Accordingly, the defendant voluntarily, knowingly, freely and intelligently waived his Miranda rights and was aware of the consequences of that waiver.

With respect to the defendant's second argument, that Detective Reid did not accurately recite the Miranda warnings to him, the undersigned has reviewed excerpts of the hearing transcript and finds that the argument lacks merit. Detective Reid's recitation of the Miranda rights was proper. "[W]arnings that convey the substance of the suspect's rights are sufficient...." United States v. Hernandez, 93 F.3d 1493, 1502 (10th Cir.1996). Here, Detective Reid's recitation of the defendant's Miranda rights were adequate and the defendant's post-arrest statements should not be suppressed.

## RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the defendant Richard Pierre Cambronne's Motion to Suppress Contraband and Post-Arrest Statements (DE# 25, 10/05/06) be **DENIED.** Pursuant to 28 U.S.C. §636(b)(1)(B) and (C), the parties may serve and file written objections to this Report and Recommendation with the Honorable Ursula Ungaro-Benages, United States District Judge, within ten (10) days of receipt of a copy of this Report and Recommendation. See Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982).

DONE AND ORDERED in Chambers, at Miami, Florida, this **26th** day of October, 2006.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
U.S. District Judge Ungaro-Benages
All Counsel of Record